# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

ACCESS LIMOUSINE SERVICE, INC.,

    Plaintiff,

v.

SERVICE INSURANCE AGENCY, LLC and
TIMOTHY O'BRYAN,

    Defendants.

Civil Action No. TDC-15-3724

## MEMORANDUM OPINION

In 2013, Defendants Service Insurance Agency, LLC ("SIA"), an insurance brokerage, and Timothy O'Bryan, an insurance broker, notified Plaintiff Access Limousine Service, Inc. ("Access") that Access's insurance policy would not be renewed for the following year. According to Access, Defendants did not give Access sufficient notice of the nonrenewal to permit Access to obtain a new insurance policy before its coverage lapsed, and the resulting lapse in coverage damaged Access's business. Access has now brought this civil action, alleging that Defendants' conduct was negligent and that Access is entitled to $500,000 in damages as a result. Defendants have filed a Motion for Summary Judgment in which they assert that they are entitled to summary judgment because Access cannot prove damages. For the reasons that follow, the Motion is GRANTED.

# BACKGROUND[1]

## I. The Insurance Policy

Access provides transportation services and is required to maintain a commercial vehicle insurance policy in order to operate its business. From 1993 to 2013, Access maintained such an insurance policy administered by SIA. O'Bryan served as Access's broker and was responsible for the renewal, adjustment, and administration of Access's insurance policy.

On May 31, 2013, Access provided SIA with a completed application to renew its insurance policy, which was set to expire on August 12, 2013. Access did not hear from O'Bryan or any other SIA employee until August 7, 2013, when Defendants informed Access that the policy could not be renewed and would be expiring in five days. Access was unable to procure new insurance before the policy expired on August 12, 2013. As a result, it could not operate its business until it obtained new coverage in September 2013.

## II. Damages

Access has claimed that it suffered lost profits as a result of Defendants' negligent conduct. In an interrogatory response, Access claimed that it "sustained damages of approximately $10,000,000" because it was "left without insurance coverage for 30 days." Interrog. No. 6, Mot. Summ. J. Ex. B at 5, ECF No. 57-3. Specifically, Access asserts that it lost profits when TripperBus, a company with which Access had a service contract it claims was worth $1.9 million, terminated that contract on August 12, 2013 because Access no longer had vehicle insurance. Access also claims that it lost profits relating to "prospective business

---

[1] The Court has previously set forth the core facts of this case in its October 19, 2016 Memorandum Opinion on Defendants' first and second motions for summary judgment. *See Access Limousine Serv., Inc. v. Serv. Ins. Agency, LLC*, No. TDC-15-3724, 2016 WL 6126267, at *1-2 (D. Md. Oct. 19, 2016).

opportunities" that were thwarted by the loss of insurance. Pl.'s Opp'n Mot. Summ. J. ("Opp'n") at 1-2, ECF No. 58.

To establish the alleged lost profits relating to the cancellation of the TripperBus contract, Access provided an interrogatory response stating that due to the lapse in insurance:

> Access was unable to operate and its contract with T[r]ipperBus, another transportation company . . . was immediately terminated resulting [in] the laying off of 98% of Access's workforce. The T[r]ipperBus contract was worth $1,900,000.00. Access continued to suffer losses of revenue due to the layoffs. Had Access not been forced to lay off its workforce and not lost the contract with T[r]ipperbus, Access would have had estimated annual revenues of $3,000,000.00 to $5,000,000.00 between 2013 and the present.

Interrog. No. 6, Mot. Summ. J. Ex. B at 5-6. Access also provided a letter dated November 15, 2016, attached as an exhibit to Access's Opposition, in which a TripperBus official stated that:

> This is to confirm as of August 12, 2013 I terminated the contract between Access Limousine and TripperBus to and from NY and Arlington/Bethesda due for not be able [*sic*] to provide TripperBus a Certificate of Insurance.

Opp'n Ex. 2, ECF No. 58-2. In addition, Access offered the deposition testimony of Keyvan Shokraei, Access's President, who testified that "[w]e had a contract that once they find out our insurance is cancelled, they withdraw their contract," such that Access did not "make that money." Shokraei Dep. at 16:14-21, Dec. 6, 2016, Opp'n Ex. 3, ECF No. 58-3 (hereinafter, "2nd Shokraei Dep."). However, Shokraei admitted that he did not know how much the contract would have generated in profits for Access. No other evidence in the record describes the TripperBus contract.

As for the lost profits on "prospective business opportunities," Access relied on the deposition testimony Shokraei as well as that of Anna Anderson, the Access employee in charge of Access's books and records. Shokraei was unable to establish Access's profit or loss for August 2013, the month of the insurance cancellation. He estimated that the profit margin for the year prior to that month was "35 to 40 percent," 2nd Shokraei Dep. at 21:11-19, but admitted

that this figure represented Access's monthly targets rather than actual profits and was based on speculation:

> Q: On what do you base your estimate that your profit margin was about 35 to 40 percent?
>
> A: Based on how much our expenses are.
>
> Q: What documents were reviewed in arriving at that conclusion?
>
> A: We always operate our prices between 35 to 40 percent. Now, if we can't get that much, that's a different story, but this is what we base it on.
>
> Q: So, in other words, that was the goal was the 35 to 40 percent?
>
> A: Correct.
>
> Q: But you can't tell me for a fact that that's what it was the year prior to the loss?
>
> A: I can't tell you right now for a fact, no. But this is what we based on.
>
> Q: Is it fair to say you're speculating as to what your profit margin would have been the year prior to the loss?
>
> Mr. Gelber: Objection. You can answer.
>
> The Witness: At the moment, yes.

*Id.* at 21:17-23:16.

Although Shokraei identified Anderson as the Access employee in charge of bookkeeping, Anderson could not calculate Access's profits during August 2013 or any other month in that time period:

> Q: So I take it, given the difficulties in determining what your revenue was for that particular month, for August of 2013, July of 2013, whichever you want to pick, and being unable to tell me what precisely the overhead was for that same time period, you wouldn't be able to tell me what the profits were for that time period?
>
> A: I would not.

Anderson Dep. 18:19-19:4, Mot. Summ. J. Ex. C, ECF No. 57-4. She later admitted that she would be unable to identify the amount of lost profits sustained as a result of the lapse in insurance without the assistance of an accountant:

> Q: [W]ithout knowing what your expenses were, without knowing exactly what the revenues were, how would you be able to tell me what the lost profits were?
>
> A: I wouldn't.
>
> Q: You wouldn't be able to?
>
> A: No. Our accountant would need to do that.

*Id.* at 42:8-14.

However, Mike Zandieh, whom Access identified as its accountant, stated in an affidavit that he never served as the accountant for Access, but instead provided the limited services of preparing "weekly payroll and filings for federal and local government agencies." Zandieh Decl. ¶¶ 2-3, Mot. Summ. J. Ex. E, ECF No. 57-6. Zandieh stated that he has "no information relating to [Access's] profits or losses from 2010 to present, other than what was contained in . . . profit and loss statements provided by [Access] to me at the time." *Id.* ¶ 6. Zandieh no longer has possession of those statements or any recollection of their contents. In his deposition, Shokraei agreed that if Zandieh did not have the records, and they had not been produced in the course of discovery, the records did not exist.

The record is also devoid of evidence establishing Access's revenues and expenses, the components of Access's profits, during 2013. With respect to revenue, Anderson stated that she would have been unable to identify Access's income for a month in 2013 without reviewing Access's bank statements. Instead, she claimed that Zandieh was in charge of tracking revenue. Zandieh, however, believed that Access handled all of its own accounting needs, including preparing its own profit and loss statements. As for expenses, Anderson acknowledged that she

5

did not know what the monthly operating expenses were "during the period in 2013 when Access Limousine was uninsured" and agreed that she would not be able to make such a determination. Anderson Dep. at 41:20-42:5. Anderson also testified that the only way she could determine Access's overhead expenses, such as salaries or payments on vehicles, was "to go back to the bank statement." *Id.* at 17:16-17. No bank statements are in the record before the Court. Furthermore, neither Shokraei nor Anderson could quantify Access's debts or calculate payments made on debt, because Access did not maintain reports on accounts receivable or accounts payable and did not record payments to Access creditors made by third parties.

As for documentary evidence relating to lost profits, Access has provided unsigned income tax returns for Access for the years 2010, 2011, 2012, and 2013. Access contends that the tax returns demonstrate that Access "had an average profit of approximately 36 percent" during the three years before 2013, which then dropped significantly in 2013. Opp'n at 10-11. Access has not provided any other records or evidence relating to the alleged lost profits caused by the lapse in insurance.

### III. Procedural History

Access initially filed this suit in the Circuit Court of Maryland for Prince George's County, asserting that Defendants are liable for $500,000 in damages for losses suffered during the period it was unable to operate because it was uninsured. Defendants timely removed the matter to this Court. After filing an Amended Answer on April 5, 2016, Defendants filed a motion for summary judgment, arguing that Access's lawsuit was barred by the doctrine of judicial estoppel due to Access's failure to disclose its claim in bankruptcy proceedings. While that motion was pending, the parties proceeded to discovery. Defendants filed a motion to strike Access's expert designations, as well as a second motion for summary judgment in which

Defendants argued that Access would be unable to prove its case in the absence of expert testimony. After a hearing on September 14, 2016, United States Magistrate Judge Charles B. Day granted the motion to strike Access's damages expert. The Court denied both motions for summary judgment on October 19, 2016. Following the close of discovery, Defendants filed the present Motion.

## DISCUSSION

Defendants assert that summary judgment is warranted because Access cannot prove its damages with any reasonable certainty. Access argues that facts in the record create a genuine issue of material fact on the existence of damages and that evidence showing its successful track record in the transportation industry, and the loss of its contract with TripperBus, establishes a basis for a jury to determine damages with reasonable certainty.

### I. Legal Standards

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if

sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

Access's claim against Defendants is based on what it describes as "SIA's deviation from the standard of care owed to [Access] regarding the renewal/nonrenewal of insurance as required under Maryland law," Opp'n at 1, a claim that asserts a form of negligence. To prevail on a negligence claim, a plaintiff must establish four elements: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; (3) causation of injury; and (4) damages. *See Schultz v. Bank of America, N.A.*, 990 A.2d 1078, 1086 (Md. 2010); *Wash. Metro. Area Transit Auth. v. Seymour*, 874 A.2d 973, 976-77 (Md. 2005). The plaintiff must be able to show facts supporting each element. *See Green v. N. Arundel Hosp. Ass'n, Inc.*, 785 A.2d 361, 367 (Md. 2001).

Defendants' Motion does not challenge the first three elements. Instead, Defendants claim that Access cannot show a dispute of material fact as to damages because it has failed to provide any evidence of the damages allegedly caused by their conduct. "[A]ctual damages are a prerequisite for liability in negligence cases." *Peroti v. Williams*, 267 A.2d 114, 119 (Md. 1970) (stating that "nominal damages, or 'technical liability' do not exist" in a negligence case). *See also Supik v. Bodie, Nagle, Dolina, Smith & Hobbs, P.A.*, 834 A.2d 170, 182 (Md. Ct. Spec. App. 2003) (stating that a negligence claim requires "actual injury or loss" and "the mere possibility of an injury in a negligence action does not give rise to a cause of action"). "Damage (or injury) is an essential element of actionable negligence just as are 'duty' and breach' essential elements of a negligence plaintiff's proof. When there is a finding by a jury that one or more of these elements is missing the cause of action fails." *MacCubbin v. Wallace*, 400 A.2d 461, 463 (Md. Ct. Spec. App. 1979). In addition, a plaintiff may recover "only those damages that are affirmatively proved with reasonable certainty," not those "which are speculative or conjectural."

*Jones v. Malinowski*, 473 A.2d 429, 435 (Md. 1984); *Edmonds v. Cytology Servs. of Md., Inc.*, 681 A.2d 546, 558 (Md. Ct. Spec. App. 1996) ("[I]n order to recover, the plaintiff's injury or loss must be proven with reasonable probability or certainty, and cannot be the subject of mere speculation or conjecture."), *aff'd sub nom. Rivera v. Edmonds*, 699 A.2d 1194 (Md. 1997).

Because damages are an essential element of a negligence claim, Access must "come forward with *specific* evidence tending to show that it did in fact suffer damages." *Cf. Planmatics, Inc. v. Showers*, 30 F. App'x 117, 119-20 (4th Cir. 2002) (granting summary judgment on a breach of contract claim where the plaintiff failed to create a genuine issue of material fact on the existence of actual damages). Access need not demonstrate with precision the amount of damages sustained in order to establish a genuine issue of material fact. Rather, the evidence need only establish a rational, non-speculative basis from which a fact finder can make a fair and reasonable estimate of damages. *See Jansen v. Baker*, No. Civ.A.CCB-04-610, 2005 WL 2065232, at *6 (D. Md. Aug. 25, 2005) (citing *Brock Bridge Ltd. P'ship, Inc. v. Dev. Facilitators, Inc.*, 689 A.2d 622, 628-29 (Md. Ct. Spec. App. 1997)).

## II.   Motion for Summary Judgment

In seeking summary judgment, Defendants claim that Access has failed to offer evidence to prove damages with any reasonable certainty because the Court struck Access's damages expert, the Access employees with knowledge of Access's finances have admitted they cannot discern the amount of lost profits incurred by Access, and Access has not produced financial records that would prove lost profits with any reasonable certainty. According to Access, the evidence in the record is sufficient, at a minimum, to demonstrate a genuine issue of fact on whether (1) Access suffered damages from the termination of the TripperBus contract, which

was precipitated by Access's loss of vehicle insurance; and (2) Access otherwise lost profits because the loss of insurance prevented it from pursuing prospective business opportunities.

In its memorandum opinion of October 19, 2016, the Court denied Defendants' second motion for summary judgment, which was premised on the argument that an expert witness is necessary to establish the existence and amount of damages. *See Access Limousine Serv., Inc. v. Serv. Ins. Agency, LLC*, No. TDC-15-3724, 2016 WL 6126267, at *7-8 (D. Md. Oct. 19, 2016). Although the Court concluded that, in theory, "Access's recognition that an expert might be useful to the jury does not mean that Access cannot prove the existence of some damages without an expert," *id.* at 8, a review of the record established since that ruling reveals that, in practice, Access cannot do so.

In a tort action for negligence in Maryland, the plaintiff may recover "only those damages that are affirmatively proved with reasonable certainty," not those "which are speculative or conjectural." *Jones*, 473 A.2d at 435; *Edmonds*, 681 A.3d at 558. *Cf. M&R Contractors & Builders, Inc. v. Michael*, 138 A.2d 350, 355 (Md. 1958) (stating that in a breach of contract case, lost profits must be proven to a "reasonable certainty"). The evidence in the record is insufficient to establish damages under this standard. Although Access stated, in an interrogatory response, that it sustained "damages of approximately $10,000,000" and that it was forced to lay off its workforce, no evidence has been submitted that supports the $10 million figure, and Access has provided no other evidence relating to layoffs. Nothing in the record identifies the relevant period during which Access's profits were harmed by the lapse in insurance, or any reasonable method of calculating what its lost profits might have been.

Access has neither established, nor provided any evidence showing, that any prospective business opportunities were available but lost due to the lapse in insurance. Access's only

specific claim that it suffered damages as a result of Defendants' alleged negligence is that TripperBus, another transportation company, canceled an existing contract with Access valued at $1.9 million because Access lost its insurance coverage. Despite this broad allegation, Access has not provided admissible evidence to support the alleged loss and a reasonable estimate of the damages suffered. First, Access has not submitted the underlying contract. Although the lack of evidence of a specific contract is not necessarily dispositive on the issue of lost profits, *see Hoang v. Hewitt Ave. Assocs., LLC*, 936 A.2d 915, 942-43 (Md. Ct. Spec. App. 2007), Access has not otherwise provided evidence to substantiate its claim. The November 15, 2016 letter from a TripperBus official stating that the company "terminated the contract between Access Limousine and TripperBus to and from NY and Arlington/Bethesda due for not be able [*sic*] to provide TripperBus a Certificate of Insurance," is inadmissible hearsay. It is not a sworn affidavit or declaration, and having been drafted over three years after the events in question, and after the initiation of this lawsuit, it does not meet the business record exception to the hearsay rule. *See* Fed. R. Evid. 803(6); Fed. R. Civ. P. 56(c)(2); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (stating that the nonmoving party must carry its burden by offering "sufficient proof in the form of admissible evidence").

Regardless, neither the letter, nor the interrogatory response stating that the contract was "worth $1,900,000," Mot. Summ. J. Ex. B at 5, nor Shokraei's testimony offers admissible evidence sufficient to calculate, even as a reasonable estimate, the lost profits sustained by Access. In particular, this evidence does not establish the expenses Access would have incurred in fulfilling the contract, a necessary component to determine whether Access lost profits and in what amount. Such evidence that is not "significantly probative," and at best "merely colorable," is insufficient to defeat a motion for summary judgment. *See Bouchat*, 346 F.3d at

522 (quoting *Anderson*, 477 U.S. at 249); *Planmatics*, 30 F. App'x at 121 (finding that "vague and unsubstantiated responses to interrogatories are simply insufficient to create a genuine issue of material fact").

None of the other evidence presented by Access supports a finding of lost profits damages in any amount, whether related to the TripperBus contract or any other business opportunity, that were caused by the insurance cancellation. Notably, the witnesses who could potentially testify about lost profits were unable to do so. Access's President, Keyvan Shokraei, estimated that the profit margin for the year prior to that August 2013 was "35 to 40 percent," but acknowledged that this figure represented Access's monthly targets rather than actual profits and was based on speculation. 2nd Shokraei Dep. at 21:17-23:16. Access's bookkeeper, Anna Anderson, stated that she could not calculate Access's profits during August 2013 or any other month in that time period, and that she would be unable to identify the amount of lost profits sustained as a result of the lapse in insurance without the assistance of an accountant. In turn, the identified accountant, Mike Zandieh, has stated in an affidavit that he never served as the accountant for Access but instead provided services relating to payroll and government filings. Zandieh stated that he has "no information" relating to Access's profits or losses from 2010 to present. Zandieh Decl. ¶¶ 5-6.

As for records, the only documents identified by Anderson as potentially useful to an analysis of profits, the company's bank statements, were not submitted into the record. Zandieh stated that to the extent that he ever had profit and loss statements or other records that would show such information, he no longer has possession of those statements or any recollection of their contents. In his deposition, Shokraei acknowledged that if Zandieh did not have such records, they do not exist.

12

The only available records that could potentially establish lost profits resulting from the loss of insurance are unsigned copies of Access's federal income tax returns for 2010, 2011, 2012, and 2013. At a first level, these records are not admissible evidence. They are unsigned, and the individual listed as the preparer of the returns, Zandieh, has not otherwise verified their authenticity, so they have not been established as business records under Federal Rule of Evidence 803(6). *See Guessous*, 828 F.3d at 216.

Even if the tax returns are authentic and admissible, they do not provide sufficient evidence to establish damages. First, although Access claims that the returns show that Access's profits in 2013 were significantly lower than in the earlier years, it is unclear whether that is true. On its face, the 2013 tax return shows "ordinary business income (loss)" of "-7,104," Opp'n Ex. 6 at 1, ECF No. 58-6, which is a smaller "loss" than the 2012 tax return's figure of "-122,201," Opp'n Ex. 7 at 1, ECF No. 58-7. Access asserts that the correct measure of profits can be gleaned from the tax returns and should be calculated by subtracting out depreciation from adjusted gross income. At that point, however, where profit is calculated pursuant to a formula using various inputs from within the tax returns, it is clear that the tax returns cannot be used to show lost profits without expert testimony, which is unavailable to Access. Moreover, even if the tax returns can be deemed to show a reduction in profits from one year to the next, they do not provide data that, on its face, establishes what reduction in profits, if any, occurred after the August 2013 cancellation of insurance, nor do they establish the cause of any such loss. *See Birch Assocs., LLC v. IKEA U.S. East, LLC*, No. PJM-10-2257, 2012 WL 5947513, at *2-3 (D. Md. Nov. 27, 2012) (finding that corporate tax returns were insufficient evidence of lost profits to create a genuine issue of material fact as to damages). Thus, expert testimony, such as from an accountant, would be necessary in order to use the tax returns to make any plausible

calculation of lost profits attributable to the insurance cancellation. Because Access has not identified, and may not identify, such an expert witness, Access cannot establish "that the factfinder could reasonably decide" that it lost profits due to Defendants' conduct. *See Dash v. Mayweather*, 731 F.3d 303, 314 (4th Cir. 2013); *Planmatics*, 30 F. App'x at 119-20.

Access's reliance on *Hoang v. Hewitt Avenue Associates*, 936 A.2d 915 (Md. Ct. Spec. App. 2007), is misplaced. Access argues that under *Hoang*, evidence of a business's track record and experience is sufficient to make a calculation of lost profits reasonably certain and not speculative, and that Access's record of success in the transportation industry constitutes evidence based on which a jury could find damages. In *Hoang*, the plaintiff, a developer, entered into a contract with the defendants to purchase two parcels of undeveloped land on which to construct townhouses. *Id.* at 918. When the defendants failed to close the sale, the developer sued to recover "the profits it anticipated it would have realized upon sale of the 14 town houses it planned to construct on the property, and would have constructed but for the appellant's . . . breach by failure to convey." *Id.* at 941-42. Although the court considered evidence that the developer was an established real estate firm with a track record of success, the developer also offered expert witness testimony about "the costs it likely would have incurred," "the probability of the completed town houses being sold," "the prices the finished townhouses would have fetched on the real estate market as it existed at the relevant time, and the profit that would have been returned . . . on the expected sales," evidence which was "unrefuted and unchallenged." *Id.* at 943-44.

Here, in contrast, Access has not and cannot present expert testimony that would support a finding of lost profits attributable to the insurance cancellation, whether in relation to the TripperBus contract or any other business opportunity. The lay witnesses and documents

14

provide no evidence of revenues, expenses, or other indicators of profits from which a factfinder could make a reasonable estimate, without the assistance of expert testimony, of any lost profits caused by the insurance cancellation. Accordingly, Access has not satisfied its burden "to provide nonspeculative evidence establishing a genuine dispute as to the existence of such damages." *Dash*, 731 F.3d at 314. Because damages are an essential element of a negligence claim under Maryland law, and Access has been unable to provide evidence from which the factfinder could determine damages suffered with reasonable certainty, Defendants are entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment is GRANTED. The case will be dismissed. A separate Order shall issue.

Date: August 11, 2017

THEODORE D. CHUANG
United States District Judge